**The court incorporates by reference in this paragraph and adopts as the findings and orders of this court the document set forth below. This document has been entered electronically in the record of the United States Bankruptcy Court for the Northern District of Ohio.**



Mary Ann Whipple
United States Bankruptcy Judge

**Dated: December 05 2007**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | | |
|---|---|---|
| In Re: | ) | Case No. 07-31690 |
| | ) | |
| Todd Carney and | ) | Chapter 7 |
| Shawna Carney, | ) | |
| | ) | |
| Debtors. | ) | JUDGE MARY ANN WHIPPLE |

### MEMORANDUM OF DECISION AND ORDER

This case is before the court on the United States Trustee's ("the UST") motion to dismiss Debtors' Chapter 7 case for abuse under 11 U.S.C. § 707(b)(1) and (3) [Doc. # 20] and Debtors' response [Doc. # 23]. The court held a hearing on the motion that Debtors, their counsel and counsel for the UST attended in person and at which the parties had the opportunity to present testimony and other evidence in support of their respective positions. The court has jurisdiction over this case under 28 U.S.C. §1334 and the general order of reference entered in this district. Proceedings to determine a motion to dismiss a case under § 707(b) are core proceedings that the court may hear and decide. 28 U.S.C. § 157(b)(1) and (b)(2)(A). Having considered the briefs and arguments of counsel and having reviewed the record in this case, for the reasons that follow, the court will grant the UST's motion and dismiss Debtors' Chapter 7 case unless they convert it to Chapter 13.

### BACKGROUND

Debtors are married and have two dependent children, ages eleven and four. Todd Carney is a branch manager at Merry X-ray where he has been employed for twelve years. He earns approximately

$55,200 per year. Shawna Carney is a district supervisor at Sears where she has been employed for one year. She earns approximately $24,000 per year. On April 28, 2007, Debtors filed a petition for relief under Chapter 7 of the Bankruptcy Code, stating that their debts are primarily consumer debts.

Debtors' Schedule D shows total secured debt in the amount of $357,458. Debtors' secured debts include $285,365 secured by their home, which they value at $220,000, as well as $25,000 secured by Debtors' 2007 camper, $22,093 secured by a 2007 Dodge Caravan, and $25,000, which the court presumes is secured by a 2005 Ford Mustang.[1] As set forth in their Schedule D, however, the debt secured by the camper is substantially understated. The debt that Debtors reaffirmed on the camper was not $25,000 but $35,896.56. [UST Ex. 1]. Their bankruptcy schedules also show unsecured nonpriority debts, consisting almost entirely of credit card obligations, in the total amount of $93,734. Debtors do not have any priority unsecured debt.

Debtors' Schedule I shows gross monthly income in the combined total amount of $6,601.97 and net monthly income after payroll deductions in the combined total amount of $4,885.08. Debtors indicate in their Form B22A Chapter 7 Statement of Current Monthly Income and Means-Test Calculation that their current monthly income based on the average of their gross income derived over the six months before the filing was $8,043.77 before deductions. The reason for the $1,400 discrepancy between Debtors' monthly gross income based on an average of the last six months and the income status claimed at the time of filing on Schedule I is not shown on the record. Debtors' pay advices for the 60 days preceding commencement of the case evidence that Todd Carney's gross monthly pay ($2,123.52 every two weeks) is as set forth on Schedule I, while Shawna Carney's gross pay varies every second pay period due to a bonus amount, but appears to be understated on Schedule I based on her pay advices (*e.g.* gross pay from January 28, 2007, through February 24, 2007, which is less than a month, was $2,446 as compared to $2,000.01 set forth on Schedule I). Payroll deductions from Todd Carney's income include $184 for contribution to his 401(k) plan. Debtors also received over $9,000 in income tax refunds for 2006.

Debtors' Schedule J shows total monthly living expenses in the amount of $7,198. Debtors' reported monthly expenses include, among other things, mortgage expenses of $2,560, property tax in the amount of $300, homeowner's insurance expense of $90, home related utility expenses of $584, total telephone expense of $220, cable TV expense of $170, recreation expenses of $400, total car payments of

---

[1] Debtors fail to include a description of the property subject to the $25,000 secured claim of Great Lakes Credit Union shown on Schedule D. However, in his Statement of Intention, Todd Carney indicates that the 2005 Ford Mustang secures a debt with Great Lakes Credit Union that he intends to reaffirm

2

$862 and a payment on their camper of $342.

Debtors' Statements of Intention indicate that they intend to reaffirm all of their secured debt. At the time of the hearing, they had reaffirmed the $35,896.56 debt secured by their new camper. [UST Ex. 1; Doc. # 19]. The Statement In Support of Reaffirmation Agreement, signed by both Debtors, states, contrary to their Schedule J, that their "actual current monthly expenses including monthly payments on post-bankruptcy debt and other reaffirmation agreements total $4,000, leaving $700 to make the required payments on this reaffirmed debt." [Doc. # 19, p. 8].

Debtors' Statement of Financial Affairs shows that they had joint income of $76,016 in 2005 and $78,041 in 2006. Debtors' Form B22A shows that, based on their earnings over the six month period before filing, their annualized current monthly income was $96,525.24. That amount is nearly $30,000 above the applicable median income of $66,734.00 for a family of four in Ohio. No presumption of abuse arose under § 707(b)(2) after calculation of allowed deductions, primarily because of Debtors' large monthly payments on secured debt. Instead the UST filed a timely motion to dismiss for abuse under § 707(b)(3) based on the totality of the circumstances.

## LAW AND ANALYSIS

This case must be decided under the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005, Pub. L. No. 109-8, 119 Stat. 23, ("BAPCPA" or "the Act") because it was filed on April 28, 2007, after the effective date of the Act. Where debts are primarily consumer debts, the court may, after notice and a hearing, dismiss a Chapter 7 petition "if it finds that the granting of relief would be an abuse of the provisions of [Chapter 7]." 11 U.S.C. § 707(b)(1). Before BAPCPA, courts considered whether to dismiss a case for "substantial abuse" under § 707(b) based on the "totality of the circumstances." *See, e.g., In re Krohn*, 886 F.2d 123, 126 (6th Cir. 1989); *In re Price*, 353 F.3d 1135, 1139 (9th Cir. 2004). The Sixth Circuit explained that "substantial abuse" could be predicated upon either a lack of honesty or want of need, to be determined by the totality of the circumstances. *Krohn*, 886 F.2d at 126. Congress incorporated this judicially created construct in § 707(b)(3) by requiring a court to consider "(A) whether the debtor filed the petition in bad faith; or (B) the totality of the circumstances . . . of the debtor's financial situation demonstrates abuse." 11 U.S.C. § 707(b)(3)(A) and (B). Although pre-BAPCPA case law applying these concepts is still helpful in determining abuse under § 707(b)(3), under BAPCPA Congress has lowered the standard for dismissal in changing the test from "substantial abuse" to "abuse." *In re Mestemaker*, 359 B.R.

3

849, 856 (Bankr. N.D. Ohio 2007).[2]

In this case, the UST contends that Debtors are not needy and have the ability to repay a significant portion of their unsecured debt. Factors relevant to determining whether a debtor is "needy" include the ability to repay debts out of future earnings, which alone may be sufficient under some circumstances to warrant dismissal. *Krohn*, 886 F.2d at 126. Other factors include "whether the debtor enjoys a stable source of future income, whether he is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code, whether there are state remedies with the potential to ease his financial predicament, the degree of relief obtainable through private negotiations, and whether his expenses can be reduced significantly without depriving him of adequate food, clothing, shelter and other necessities." *Id.* at 126-27.

Debtors defend the motion by pointing to their filed Schedules I and J and to their Form B22A means test form. They argue that their Schedules I and J show their monthly expenses are so substantial that they cannot afford on an annual income of over $75,000 to support a family of four and still repay any of their credit card debt. The court acknowledges that Debtors' Schedule I shows monthly income after payroll deductions of $4,885 and their Schedule J shows monthly expenses of $7,198, for a stated negative monthly cash flow of $2,313. As to the means test form, Debtors argue that it shows that they would not be required to pay their unsecured creditors anything under a Chapter 13 plan, making conversion a waste of time and resources.

The court will address below the parties' arguments and the relevant factors comprising the totality of the Carneys' financial circumstances.

<u>Debtors' Income</u>

Todd Carney enjoys stable employment, having been employed at the same job for twelve years. Although Shawna Carney has worked in her current job for only one year, there is no indication that she is in danger of losing it. Nor is there any indication that any catastrophe or unexpected event such as family medical problems or unemployment precipitated their bankruptcy filing. Debtors' income is substantially above the median. And there is no indication that either Debtor anticipates a material decrease in their incomes in the next five years. Their Statement of Financial Affairs shows that Debtors' joint annual income increased from $76,016 in 2005 to $78,041 in 2006. Moreover, Debtors' pay advices show that

---

[2]While Congress has clearly lowered the dismissal standard, articulation of what that change really means in decision-making in a particular case is a slippery enterprise at best. A totality of circumstances amounting to substantial abuse would obviously also amount to abuse. The converse is not necessarily true. Perhaps more telling legislative evidence of a Congressional intent that bankruptcy courts should now afford less deference to a debtor's choice of Chapter 7 relief is the elimination from amended § 707(b) of the language in former § 707(b) stating that "[t]here shall be a presumption in favor of granting the relief requested by the debtor."

4

Shawna Carney's monthly income at the time of filing is understated on Schedule I.

Ability to Pay

As to Debtors' argument based on Schedules I and J that they lack any ability to pay their unsecured creditors, the court doubts the factual credibility of Debtors' schedules as presenting an accurate financial picture. As explained above, it appears that Debtors have understated Shawna Carney's income and therefore their overall total income on Schedule I when compared to their pay advices.

But the longest shadow cast on the accuracy of Debtors' Schedules I and J arises from the reaffirmation agreement that they filed with respect to the $35,896.56 debt secured by their 2007 camper, a leisure vehicle that has not been shown as necessary in any way for their maintenance or support or that of their dependents. [UST Ex. 1]. The UST relies on this document to show that Debtors have the ability to repay their debts out of future income. In Debtors' Statement in Support of Reaffirmation Agreement, they state that, after their actual monthly expenses, they are still left with $700 per month with which to make the monthly payment of $342 on the reaffirmed camper debt. In light of Debtors' post-petition representations and their otherwise inexplicable willingness to reaffirm recently incurred secured debt of $35,896.56 for an unnecessary luxury item, *see In re Haar*, 360 B.R. 759, 768 (Bankr. N.D. Ohio 2007)(debtors reaffirming on a high amount of secured debt, especially for luxury items, may be subject to an action to dismiss under § 707(b)(3)(*dicta*)), the court finds that the expenses reported on Schedule J are more likely than not substantially inflated.

Debtors chose not to testify to explain the differences between their representations in the Reaffirmation Agreement and the information presented in their Schedules I and J. Instead, Debtor's counsel argued that the court should disregard Debtors' Statement in Support of Reaffirmation Agreement because, unlike their schedules, it was not signed under oath. Apart from the obviously unacceptable implication that Debtors felt free to misrepresent facts to the court because the statement was not required to be signed under oath, the court finds that the representations made in their Statement in Support of Reaffirmation Agreement are probative of Debtors' perception of their actual financial situation and affairs. The facts shown on the Statement in Support of Reaffirmation Agreement have independent legal significance under 11 U.S.C. § 524(k)(6)(A) and (m), and are intended to induce court action or inaction. Counsel also certified in Part C of the Reaffirmation Agreement that it would *no*t be an undue hardship on Debtors or their dependents to reaffirm this $35,896.56 debt requiring $342 monthly payments.

In contradiction of Debtors' Schedules I and J showing that they cannot afford even ongoing secured debt payments, all of which they otherwise inexplicably indicate on their Statements of Intentions

5

that they intend to reaffirm, Debtors have indicated that they can afford not only to make $342 in monthly payments ($4,104 annually) on a 2007 model camper, but that they believe they will have funds left over after doing so. If this $700 were instead applied to repay creditors over the 60 month maximum Chapter 13 plan duration for above-median income debtors, 11 U.S.C. § 1322(d)(1), Debtors would on that basis alone have nearly $39,000 available after payment of the Chapter 13 Trustee's administrative expenses to pay on $93,734 in unsecured debt, a distribution percentage of approximately 42%. *See In re Behlke,* 358 F.3d 429, 437 (6th Cir. 2004) (finding *substantial* abuse where debtors had the ability to pay at least a 14% dividend to their unsecured creditors). Debtors' own representations on the record show that they have the ability to repay a meaningful portion of their unsecured debt out of stable future income.

Eligibility for Chapter 13 Relief

Debtors point to Line 50 of their Form 22A Chapter 7 Statement of Current Monthly Income and Means-Test Calculation, which shows that they have monthly disposable income under § 707(b)(2) of negative $2,505.75.[3] Although the forms are not identical, a Form B22C Chapter 13 Statement of Current Monthly Income and Means-Test Calculation could be expected to result in a similar negative number for monthly disposable income; Debtors would be entitled to the same deductions from current monthly income, including for their substantial secured debt payments.

Pre-BAPCPA, the "disposable income" used to calculate Chapter 13 plan payments to cover administrative, secured, priority and general unsecured claims was defined as "income which is received by the debtor and which is not reasonably necessary to be expended for the maintenance or support of the debtor or a dependent of the debtor." 11 U.S.C. § 1325(b)(2) (2004). The calculation of disposable income was generally based on Schedules I and J. If a trustee or creditor objected, the court would determine the available income and reasonably necessary expenses to be used in the calculation.

BAPCPA changed the definition of disposable income, which is now to be applied to pay unsecured creditors, to use the new defined term "current monthly income," 11 U.S.C. § 101(10A). This term is also used now in determining whether a presumption of abuse arises in Chapter 7 cases under § 707(b)(2) added by BAPCPA. And as to above-median income debtors such as the Carneys, BAPCPA specifies that "[a]mounts reasonably necessary to be expended...shall be determined in accordance with subparagraphs

---

[3] The court questions the accuracy of the completion of Debtors' Form 22A insofar as Line 26 claiming $1,531.72 for alleged mandatory payroll deductions, which appears to duplicate Line 25 where $1,739.44 in deductions for employment taxes are included. There is no apparent factual basis shown anywhere on Debtors' schedules for the alleged other mandatory payroll deductions of $1,531.72. On the other hand, their means test form also shows on Line 30 child care expenses that are not evident on their Schedule J, but which would logically be incurred given that Debtors are dual income working parents of two young children. These issues do not need to be resolved to decide the UST's motion to dismiss.

6

(A) and (B) of section 707(b)(2)," 11 U.S.C. § 1325(b)(3), in other words by applying parts of the Chapter 7 "means" test. When that is done, the Carneys argue, they would not have to pay anything to their unsecured creditors under BAPCPA to be entitled to a Chapter 13 discharge because of the substantial negative disposable income number on their Form B22A. Debtors assert that, since their means test form and not Schedules I and J or any determination by the court will control disposable income for plan payment purposes, it should not be necessary to engage in the futile exercise of conversion to Chapter 13 for them to receive a bankruptcy discharge of their unsecured debt.

Setting aside whether Debtors' legal interpretation of § 1325(b) is correct, their argument finds some support in cases from other bankruptcy courts. In deciding § 707(b)(3) motions based on the totality of the circumstances, some bankruptcy judges are explicitly measuring ability to pay against a hypothetical Chapter 13 under BAPCPA. For example, in *In re Doherty*, 374 B.R. 288 (Bankr. D. Kan. 2007), the debtor's Schedules I and J showed net monthly income after expenses of $505.35, which the United States Trustee argued demonstrated an ability to pay a substantial amount of unsecured debt. In contrast the debtor's Form B22A reported negative $88.48 in monthly disposable income. Finding that "the UST does not explain how the income will be available and paid to unsecured creditors in a hypothetical Chapter 13," and that the United States Trustee otherwise failed to explain how the case was factually abusive, the bankruptcy court denied the motion to dismiss. In this court's view, however, Debtors' argument overstates still-relevant Sixth Circuit precedent as to the role of Chapter 13 in evaluating dismissal of Chapter 7 cases for abuse and misapprehends the statutory inquiry required under § 707(b)(1).

In *Krohn*, the Sixth Circuit identified as one factor to be considered in determining substantial abuse whether a debtor "is eligible for adjustment of his debts through Chapter 13 of the Bankruptcy Code." *Krohn*, 886 F.2d at 126. Krohn's debts exceeded the then-statutory limits of eligibility for Chapter 13 relief. He argued that a dismissal for substantial abuse was foreclosed by his inability to qualify for relief under Chapter 13. The Sixth Circuit rejected Krohn's argument, noting that the inability to qualify for Chapter 13 relief "should not be dispositive [of whether there is substantial abuse], since there are other factors to be considered in deciding if a debtor is needy." *Id.* Moreover, the Sixth Circuit noted that Krohn was not necessarily entitled to relief under some provision of the Bankruptcy Code as there is no constitutional right to a bankruptcy discharge. *Id.*

In *Behlke*, the Sixth Circuit characterized evaluating whether there would be sufficient disposable income to fund a Chapter 13 plan as "one way" courts determine a debtor's ability to pay creditors out of future income. *Behlke*, 358 F.3d at 435. In accord with *Krohn*, other bankruptcy courts have observed that

7

"a lack of ability by debtors to fund a Chapter 13 plan does not necessarily defeat a § 707(b) dismissal motion where there are other compelling factors which justify such dismissal." *In re Manske*, 315 B.R. 838, 841 (Bankr. E.D. Wis. 2004).

The Carneys are eligible for Chapter 13 should they choose to seek such relief as an alternative to a Chapter 7 discharge. They are individuals with regular, indeed stable, income and their debts are less than the statutory eligibility limits. 11 U.S.C. §§ 109(e), 101(30). Information that Debtors have provided to the court shows that they could fund a Chapter 13 plan that would pay a meaningful amount of their unsecured debt should they choose to do so. Debtors' argument confuses the apparent floor that must be applied to pay unsecured claims in the event of an objection by the trustee or a creditor, *In re Frederickson*, 375 B.R. 829, 838 (B.A.P. 8th Cir. 2007)(J. Federman dissent); *cf. In re Mars*, 340 B.R. 844, 849 (Bankr. W.D. Mich 2006)(pre-BAPCPA case), with what they could pay and as may also be necessary to meet other statutory confirmation requirements, including good faith in filing the petition and in proposing the plan, 11 U.S.C. § 1325(a)(3), (7). Debtors' Form B22A argument is not supported by the Sixth Circuit's still-viable pre-BAPCPA case law integrating the permissive but not mandatory consideration of the availability and contours of Chapter 13 relief into the determination of abuse under Chapter 7.

As to the language of § 707(b)(1), another bankruptcy judge in this district aptly stated as follows:

> It should also be noted that the standard under subsection 707(b) is whether "the granting of relief would be an abuse of this chapter"- *i.e.* Chapter 7. That a debtor may legitimately benefit from or even need relief under Chapter 11 or Chapter 13 has nothing to do with whether "the granting of relief would be an abuse of [Chapter 7]" under subsection 707(b).

*In re Zayas*, Case No. 06-13070, 2007 Bankr. LEXIS 1104, *8-*9, 2007 WL 987240, *3 (Bankr. N.D. Ohio April 2, 2007)(emphasis original); *see Mars*, 340 B.R. at 851-52 (in pre-BAPCPA case, court characterizes the question in determining substantial abuse as "not whether Chapter 13 is suitable for the Marses. Rather, the question is whether the Marses should be denied the right to choose the bankruptcy chapter that they believe is most suited to them."). The language of § 707(b)(1) shows that Congress did not intend that bankruptcy courts must necessarily conduct in every case a confirmation hearing on a hypothetical Chapter 13 plan to decide whether it would be an abuse under the totality of circumstances for debtors to obtain a Chapter 7 discharge. In this case, Debtors may be able to propose a plan taking advantage of a number of provisions under Chapter 13 that offer relief to financially distressed debtors. Examples are cram down of certain debts, potential surrender of some collateral in full satisfaction of debt and stripping off the

second mortgage on their home under the authority of *In re Lane*, 280 F.3d 663 (6th Cir. 2002).[4]

There are also many unsettled Chapter 13 plan legal issues under BAPCPA, including the meaning of "applicable commitment period," proper calculation of "projected disposable income," especially for above-median income debtors like the Carneys, and the role of good faith as a condition of confirmation required by 11 U.S.C. § 1325(a)(3) and (7). Contrary to the implication of Debtors' argument, the court does not believe that it is necessary, or even possible, in this case to decide the legal and factual issues that might arise should they elect to convert to Chapter 13 in order to analyze whether it would be an abuse for them to obtain a Chapter 7 discharge. Even if Debtors are correct as to what their Form B22C would show as disposable income in a Chapter 13 case, the court does not find that fact determinative of their ability to pay out of future income for purposes of deciding whether there is abuse under § 707(b)(3).

Reduction of Expenses

Even if Debtors' Schedules I and J are factually accurate, their opposition to the UST's motion suffers further from the faulty assumption that the court is required to accept all of their expenses as stated in analyzing the totality of the circumstances. Rather, it was true under pre- BAPCPA 707(b), and the court finds no principled basis why it should be different under § 707(b)(3), that a factor to be evaluated in the "neediness" calculus is whether living expenses could be reduced significantly without depriving Debtors or their dependents of adequate food, clothing, shelter, and other necessities. *In re Bender*, 373 B.R. 25, 30-31 (Bankr. E.D. Mich. 2007)(BAPCPA case); *In re Burge, – B.R.–,* Case No. 07-31169, 2007 Bankr. LEXIS 3404, *8, 2007 WL 2907508, *3 (Bankr. N.D. Ohio October 3, 2007)*; see Krohn*, 886 F.2d at 126.

Although not a substantial amount, as Debtors point out, one of the expenditures that the UST argues could be redirected to repaying creditors under the totality of Debtors' circumstances is Todd Carney's monthly voluntary contribution of $184 to a 401(k) plan. This amount is reported as a payroll deduction on Schedule I, even though Debtors do not report owning any interest in such a plan on Schedule B, s*ee* Doc. #1, Schedule B, Line 12.

Pre-BAPCA, the Sixth Circuit held in *Behlke* that it was appropriate for bankruptcy courts to treat voluntary contributions and loan repayments to retirement plans as disposable income otherwise available to repay unsecured creditors in determining under § 707(b) the ability to repay creditors out of future income. *Behlke*, 358 F.3d at 435. The holding in *Behlke* was based primarily on the Sixth Circuit's decision in the Chapter 13 case *In re Harshbarger*, 66 F.3d 775, 778 (6th Cir. 1995), in which it held that a debtor's

---

[4]Stripping off the second mortgage should the facts support it, as they appear to from Debtors' schedules, would potentially add to Debtors' unsecured debt, but would also relieve them of the second mortgage payments they identify in their Form B22A as $677 per month.

9

payments on loans from her ERISA-qualified profit sharing plan account should be treated as disposable income to be included in her Chapter 13 plan payments. Under BAPCPA, Congress statutorily overruled *Harshbarger* in that loan repayments to certain retirement plans cannot now be considered as disposable income in a Chapter 13 case. 11 U.S.C. §1322(f); *Eisen v. Thompson,* 370 B.R. 762, 771, n.14 (N.D. Ohio 2007); *see* 11 U.S.C. § 541(b)(7)(certain plan contributions also excluded as disposable income under § 1325(b)); *In re Zaporski*, 366 B.R. 758, 773, n.2 (Bankr. E.D. Mich. 2007).

While *Behlke,* to the extent it rests upon *Harshbarger*, is now less sound footing upon which to support consideration of retirement plan contributions as funds that could be used to repay creditors under the totality of the circumstances analysis of § 707(b)(3), the court disagrees with Debtors that it is inherently inappropriate to do so. First, as a matter of statutory construction, under BAPCPA Congress expressly excluded certain retirement plan loan repayments and contributions from the definition of disposable income in Chapter 13, but said nothing about them for purposes of § 707(b). Second, the fundamental principle remains that "'[t]here is an inherent unfairness in permitting a debtor to pay himself by funding his own retirement account while paying creditors only a fraction [or, as in this case, no part] of their just claims.'" *Bender*, 373 B.R. at 30 (quoting *In re Keating*, 298 B.R. 104, 110-11 (Bankr. E.D. Mich. 2003)); *Behlke*, 358 F.3d at 435. At its most basic level, the determination of a debtor's "neediness" under the totality of the circumstances remains an equitable one. *See Krohn,* 886 F.2d at 126. Notwithstanding the legislative changes to treatment of certain retirement plan contributions and loan repayments as disposable income in Chapter 13 plans, courts have thus continued, quite appropriately, evaluating them as part of the totality of the circumstances under BAPCPA § 707(b)(3). *E.g., Bender*, 373 B.R. at 30; *Zaporski*, 366 B.R. at 773; *In re Edighoffer*, 375 B.R. 789, 798-99 (Bankr. N.D. Ohio 2007).

In this case, although Debtors' ages are not a part of the record, they appear to be relatively young such that they will not be in need of their retirement funds to provide for their support any time soon. The court finds it appropriate under the circumstances of this case to consider the $184 per month contributed to Todd Carney's 401(k) plan as funds that could be used to repay creditors.

While a relevant fact in the totality of the circumstances analysis, Todd Carney's 401(k) plan contribution is dwarfed in financial significance by Debtors' claimed monthly living expenses. Debtors report monthly living expenses of $7,198 on their Schedule J. That amounts to more than $86,376 per year for support of a family of four including children ages 4 and 11. Debtors' reported Schedule J expenses, of course, include none of the unsecured credit card debt they seek to discharge and yet still exceed by $2,000 their reported income available to pay these expenses.

The United States Trustee emphasizes as unreasonable particularly the substantial expenses devoted to shelter. Debtors' most significant monthly expense is indeed for housing (mortgage, property tax and insurance ) in the amount of $2,950. This amount is an unreasonable 60% of their stated net monthly income of $4,885. Reported monthly costs for electricity and heating fuel ($350) plus water and sewer ($234) total another $584 per month, for total carrying costs for their home reported as $3,534. This amount is 72% of their stated net monthly income of $4,885. Yet Debtors have indicated their intent to retain their home and reaffirm the first and second mortgage debts encumbering it, even though they exceed the stated value of the home by $65,365.

As already emphasized, Debtors' monthly expenses include a $342 payment on their camper, plus they report other expenses of $170 a month for cable TV, $220 a month for telephones, $100 a month for clothing and $400 for recreation.[5] Except for the clothing expense, these other stated expenses are also individually and collectively unreasonable in the absence of any showing by them of particular circumstances affecting Debtors differently than other families in northwest Ohio.

The court finds the totality of Debtors' monthly living expenses inappropriate given that they are seeking a Chapter 7 discharge of their unsecured credit card debt. Debtors are thus asking certain of their unsecured creditors (although not the holder of their second home mortgage, which appears to be an unsecured creditor) to finance permanently a lifestyle that they are apparently unwilling to relinquish, including subsidizing a new camper, two expensive late model motor vehicles, an alleged monthly 401(k) plan contribution to a plan not disclosed on Schedule B and a substantially over-leveraged home that, if their Schedules are accepted at face value, they still cannot afford in any event. The court infers from the magnitude of Debtors' Schedule F unsecured debt that much if not all of the secured debt shown on Schedule D that Debtors now intend to reaffirm was incurred at a time when they already owed substantial obligations to credit card issuers.

The court finds that Debtors' stated monthly living expenses could be materially reduced without depriving them or their two dependents of adequate food, clothing, shelter or other necessities. Alternatives for doing so include surrendering their over-mortgaged residence and obtaining more affordable housing,[6]

---

[5] In their response to the motion to dismiss, Debtors state that $346 of the monthly recreation expense is for the purchase of cigarettes, as both Debtors have a smoking habit. However, at the hearing on the motion, no testimony to this effect was offered and, thus, no evidence of such is in the record before the court.

[6] Debtors having received more than $9,000 in 2006 income tax refunds, the UST also emphasizes anticipated like future refunds as a source of funds for payment of unsecured creditors. The magnitude of the refunds is likely heavily dependent on the mortgage interest deduction. The UST cannot have it both ways. Debtors cannot both find cheaper, less leveraged housing and continue to reduce their income tax liability through large mortgage interest deductions so as to produce $9,000 in annual income

11

surrendering their camper, and reducing their TV, telecommunications and recreation expenses. Debtors' failure to rein in especially housing expenses they cannot afford to maintain if their schedules are accurate mitigates strongly against affording them relief under Chapter 7. *In re Gonzalez,* –B.R.–, Case No. 07-31122, 2007 Bankr. LEXIS 3551, 2007 WL 3028423 (Bankr. N.D. Ohio October 15, 1007); *In re Zayas*, Case No. 06-13070, 2007 WL 987240, 2007 Bankr. LEXIS 1104, 2007 WL 987240 (Bankr. N.D. Ohio April 2, 2007)(BAPCPA case); *In re Hoelzel*, Case No. 07-40598, 2007 Bankr. LEXIS 3640, *25-*28 (Bankr. N.D. Ohio September 27, 2007)(BAPCPA case); *In re Nissen,* Case Nos. BK07-80605-TLS, BK07-80606-TJM*,* 2007 Bankr. LEXIS 3190, 2007 WL 2915648 (Bankr. D. Neb. August 21, 2007); *see In re Mooney*, 313 B.R. 709 (Bankr. N.D. Ohio 2004)(pre-BAPCPA case involving excessive housing expenses).

Availability of State Law or Private Remedies

The availability of debtors' remedies under state law (such as a municipal court trusteeship or credit counseling proceedings that will stop wage garnishments under Ohio law) and the relief that might be afforded through private negotiations (such as a deed in lieu of foreclosure or extension and composition agreements with particular creditors) are other factors the Sixth Circuit has identified as relevant in deciding whether it would be an abuse to grant a Chapter 7 discharge in a particular case. Neither party has addressed these factors in this case. As the United States Trustee bears the burden of proof on the motion, *In re Wright*, 364 B.R. 640, 643 (Bankr. N. D. Ohio 2007), the court will assume that there are no such state law remedies or private negotiations that will assist in resolving Debtors' financial problems.

Conclusion

The court finds that granting Debtors relief under Chapter 7 of the Bankruptcy Code would be an abuse of the provisions of that chapter given the totality of their financial circumstances. The factors that demonstrate abuse are summarized as follows: (1) contrary to their schedules Debtors have indicated on the record in a filed reaffirmation agreement, and the court finds, that they can repay a meaningful portion of their unsecured debt; (2) Debtors have stable, regular and historically rising income well above the state median; (3) no crisis or event that will have a lasting negative impact on their family financial situation precipitated the filing; (4) Shawna Carney's and thus their total income appears understated; (5) there are other unexplained schedule inaccuracies, such as no 401(k) plan identified on Schedule B; (6) Debtors intend to reaffirm substantial and unreasonable amounts of recently incurred secured debt, including for a camper and an over-leveraged home; (7) Debtors voluntarily contribute to an unscheduled retirement plan

---

tax refunds. If Debtors continue to receive income tax refunds of this magnitude, the court agrees that they would be a source of funds for repayment of unsecured creditors. Likewise a reduction in their withholding would produce more income available to them on a monthly basis.

12

at their creditors' expense; (8) Debtors are eligible for relief under Chapter 13 of the the Bankruptcy Code should they choose to seek it, regardless of the ultimate contours of a plan; (9) Debtors have made no apparent effort to reduce their living expenses as a way to repay their credit card debt before seeking a Chapter 7 discharge; and (10) Debtors could reduce their monthly living expenses without depriving themselves or their two children of adequate food, shelter, clothing, transportation and other necessities. None of these factors would necessarily individually amount to abuse in this case, but taken together they show that granting Debtors a discharge would be an abuse of Chapter 7. The lack of state law or privately negotiated remedies available to Debtors, which mitigates in their favor against a finding of abuse, is not enough to overcome the other circumstances shown on the record.

**THEREFORE**, for all of the foregoing reasons, good cause appearing,

**IT IS ORDERED** that Debtors are allowed thirty (30) days from the date of this order to file a motion to convert to a Chapter 13 case, absent which the Motion of the United States Trustee to Dismiss Pursuant to 11 U.S.C. § 707(b)(3) [Doc. #20] will be granted, and this case will be dismissed, by separate order of the court.